IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA F. HARDIMAN, | ) | CASE NO. 3:15-cv-1259 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Brenda F. Hardiman ("Hardiman"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits and Disability Insurance Benefits under Title XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Plaintiff applied for supplemental security income and disability insurance benefits in November, 2009.  (Tr. 272-279)  Ms. Hardiman alleged her disability began on June 25, 2009. (Tr. 272)  Ms. Hardiman's application was denied initially on July 22, 2010 (Tr.123-125) and after reconsideration on February 9, 2011. (Tr.133-135)  On March 23, 2011, Ms. Hardiman requested an administrative hearing. (Tr.140)

A hearing was held before the Administrative Law Judge ("ALJ"), Earl Ashford, on

January 11, 2012.  (Tr. 167)  The ALJ issued a partially favorable decision on January 25, 2012, finding that Ms. Hardiman's disability ended on March 9, 2011 due to medical improvement. (Tr. 101)  Hardiman requested a review of the hearing decision on March 27, 2012 (Tr. 200). On June 14, 2013, the Appeals Council remanded the case back to the ALJ. (Tr. 111-116)

On remand, ALJ Ashford held a hearing on October 31, 2013. (Tr. 40-70)  In a decision dated December 11, 2013, ALJ Ashford concluded that Hardiman was not disabled. (Tr. 10-39)  On January 10, 2014, Hardiman requested a review of the ALJ's decision by the Appeals Council. (Tr. 8-9)  The Appeals Council denied review, rendering the ALJ's December 11, 2013 decision final. (Tr. 1-5)

On June 23, 2015, Hardiman filed an appeal of the ALJ's final decision with this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on August 24, 2015. (Docs. 11 and 12)  Plaintiff filed her brief on the merits on October 23, 2015 (Doc. 15) and Defendant filed its brief on the merits on December 23, 2015 (Doc. 17), making the matter ripe for this court's review.

### III.   Evidence

#### A.  Personal, Educational and Vocational Evidence

Ms. Brenda Hardiman was born on September 29, 1970 and was 39 years old on the date her application was filed. (Tr. 30)  She has at least a high school education. (Tr. 30)  Ms. Hardiman does not have any past relevant work experience.  (Tr. 30)

#### B.  Medical Evidence/Records Related to Plaintiff's Mental Impairments

Ms. Hardiman sought treatment for depression and anxiety at Unison Behavioral Health in December 2008. (Tr. 539)  Psychiatrist Alamdar Kazmi, M.D. performed a psychiatric

evaluation in February 2009. (Tr. 528)  He noted that plaintiff reported hearing a voice sometimes.  (Tr. 529)  He diagnosed dysthymic disorder, chronic post-traumatic stress disorder and assigned a global assessment of functioning ("GAF") score of 55.  (Tr. 529)  Dr. Kazmi prescribed Celexa.  (Tr. 529-530)

In April 2009, plaintiff reported that she was referred to group therapy but was not feeling comfortable around people.  (Tr. 505)  Dr. Kazmi discontinued plaintiff's prescription for Celexa due to the side effect of dryness and irritation around her mouth and prescribed Zoloft.  (Tr. 504)  On July 14, 2009, plaintiff's therapist at Unison noted that plaintiff "demonstrated being overwhelmed multiple problems, & inability to prioritize & difficulty w/problem solving." (Tr. 519)

In December 2009, plaintiff reported increased stress after having a stroke and told her therapist that she avoided appointments when she did not feel like talking.  (Tr. 510)  Plaintiff did not return to Unison after the December 8, 2009 appointment.  (Tr. 501-502)

A social worker at the doctor's office referred Ms. Hardiman to Certified Nurse Practitioner David Bingham to help with depression and daily anxiety attacks.  (Tr. 877) Plaintiff saw David Bingham, PMHCNS-BC[1], on August 10, 2012.  (Tr. 880)  Plaintiff reported internal burning anger and explosive rage.  (Tr. 880)  She isolated herself and avoided groups. (Tr. 880)  She had impulsive behavior and racing, worried thoughts daily. (Tr. 880)  Plaintiff reported flashbacks of abuse and problems with sleeping.  (Tr. 880)  Plaintiff also reported hearing people call her name and hearing command voices that she was able to resist.  (Tr. 881) She stated that she would not eat sometimes because she feared that it may be poison.  (Tr. 881)

---

[1] The medical records (e.g., Tr. 964) reflect that Nurse Practitioner Bingham is credentialed as a PHCCNS-BC, signifying that he is a Board Certified Adult Psychiatric Mental Health Clinical Nurse Specialist.  *See* www.nursecredentialing.org/certificationcredentials.aspx

Mr. Bingham noted that plaintiff had a guarded attitude, depressed mood, flat affect, perceptual disorders in the form of voices, and paranoid thought content and her judgment and insight were poor.  (Tr. 884)  He diagnosed schizoaffective disorder and post-traumatic stress disorder and assigned a GAF score of 50.  (Tr. 885)  Mr. Bingham prescribed Abilify.  (Tr. 885)

Plaintiff met with her social worker on August 29, 2012. (Tr. 886)  She reported side effects from Abilify.  (Tr. 886-87)  When she met with Mr. Bingham in October 2012, plaintiff reported that she was not doing well, felt fatigued most of the time, continued to have problems sleeping and was having paranoid thoughts.  (Tr. 888)  Mr. Bingham noted that plaintiff was alert, not disoriented in time, place or person, her conversation content was appropriate, she had good concentration, but that she appeared anxious.  (Tr. 888)  Mr. Bingham prescribed Elavil (amitriptyline) and Risperdal (risperidone).  (Tr. 889)

In November 2012, Mr. Bingham noted that plaintiff continued to experience racing thoughts, difficulty falling asleep and intrusive morbid thoughts.  (Tr. 892)  He discontinued plaintiff's prescription for Elavil, increased Risperdal and added Restoril.  (Tr. 892)  By January 2013, Ms. Hardiman was sleeping better but continued to feel paranoid.  (Tr. 952)  She had spent some time with family over the holidays, but was isolating even when around family. (Tr. 952)  Mr. Bingham noted that plaintiff continued to appear anxious with impaired insight and he increased her prescription for Risperdal.  (Tr. 952-953)  In March 2013, plaintiff reported that her mood had been alright and denied any hallucinations but said that she continued to have paranoid thoughts and difficulty sleeping.   (Tr. 955)   Mr. Bingham increased plaintiff's prescription of Risperdal again.  (Tr. 955)

In April 2013, plaintiff reported that the Risperdal had completely controlled the voices. (Tr. 899)  She was sleeping better but often woke up at two or three in the morning and was

unable to fall back asleep. (Tr. 899)  Plaintiff reported feeling better but lacked motivation.  (Tr. 899)  Mr. Bingham's diagnosis continued to be paranoid schizophrenia and plaintiff's GAF score was 50.  (Tr. 899)  Mr. Bingham increased plaintiff's prescription for Restoril and added Celexa as well.  (Tr. 899)  In May 2013, plaintiff reported increased anxiety but stated that she had been able to be more social on her current medications. (Tr. 901)  She reported visiting family and going to the store. (Tr. 901)  Hardiman's GAF score continued to be 50. (Tr. 901)

In June 2013, plaintiff reported that she was still having some hallucinations but that she was more bothered by paranoid thoughts.  (Tr. 903)  She reported rarely leaving her house due to her anxiety.  (Tr. 903)  She stated that she was forgetting to take her morning medication.  (Tr. 902)  Mr. Bingham prescribed Latuda in June 2013 and decreased the prescription of Risperdal. (Tr. 903)  Hardiman's GAF score continued to be 50.  (Tr. 903)  On July 17, 2013, plaintiff reported that she no longer heard voices but that she did not want to leave her house.  (Tr. 905) When she was forced to leave, she thought about how fast she could get home.  (Tr. 905)  She reported that the Latuda made her stomach hurt badly so Mr. Bingham changed her prescription to Fanapt.  (Tr. 905)  Hardiman's GAF score continued to be 50. (Tr. 905)

In August 2013, plaintiff reported that she was having difficulty remembering her night time dose of Fanapt.  (Tr. 907)  She was continuing to have racing thoughts and paranoid ideation. (Tr. 907)  She agreed to a trial of Saphris.  (Tr. 907)  Hardiman's GAF score continued to be 50.  (Tr. 907)  At her appointment on September 4, 2013, plaintiff reported that the Saphris was not helpful.  (Tr. 909)  She was still isolating from people and hearing voices.  (Tr. 909)  Mr. Bingham increased the Risperdal to reduce the hallucinations.  (Tr. 909)  Hardiman's GAF score continued to be 50.  (Tr. 909)

Plaintiff began having problems with slurred speech so her primary doctor stopped the Risperdal at the end of September (Tr. 968-9)  When plaintiff met with Mr. Bingham on October 2, 2013, she reported that her slurred speech had not improved, she was having increased paranoia and that she wanted to go back on the Risperdal due to her increased psychiatric symptoms. (Tr. 964)  Hardiman's GAF score continued to be 50. (Tr. 964)  Mr. Bingham met with plaintiff 12 times between August 2012 and October 2013.  Each of the medical records reflects that CNP Bingham was affiliated with the medical practice of Valko and Associates.

### C.  Opinion Evidence

#### 1.  Treating Source – David Bingham – October 2013

On October 9, 2013, Mr. Bingham prepared a report, signed by supervising psychiatrist, Tim R. Valko, M.D., concerning plaintiff's ability to handle the mental demands of work on a regular and continuing basis.  (Tr. 965-966)  Mr. Bingham opined that plaintiff would be able to remember, understand and follow directions for simple tasks less than 80% of the time but more than 2/3 of the time. (Tr. 965)  He noted that she had difficult following simple changes to her medications.  (Tr. 965)  Mr. Bingham also noted that plaintiff could not stay on task even two-thirds of the workday, noting active auditory hallucinations interfered with her focus and attention.  (Tr. 965)  He also opined that plaintiff's symptoms limited her pace severely and that she would be more than 25% less productive than an unimpaired worker.  (Tr. 966)  He noted that she moved very slowly and that she was hypervigilant due to paranoia. (Tr. 966)  Mr. Bingham also believed that plaintiff would not be successful in working with the public and that she was likely to be distracted by or distraction to co-workers more than one-third of the time. (Tr. 966-7)  He opined that she would be absent, late or leave early more than three times per month due to her difficulty leaving her home.  (Tr. 966)  Mr. Bingham stated that plaintiff was

emotionally fragile and that she could only be successful in a sheltered environment.  (Tr. 967)  Finally, Mr. Bingham noted that plaintiff had a positive response to medication but that her hallucinations and delusions persisted and prohibited regular contact with the public.  (Tr. 967)

### 2.  Consulting Psychologist – Karen Robie, Ph.D., - June 2010

Karen Robie, Ph.D., performed a consultative examination in June 2010.  (Tr. 633)  Dr. Robie opined that Ms. Hardiman could relate to others on a superficial basis but did not like to do so.  (Tr. 637)  She assessed that plaintiff would have a moderate impairment if prolonged interaction were required because of social uneasiness and disinterest.  (Tr. 637)  Dr. Robie also opined that plaintiff had a mild impairment for simple tasks, increasing to an extreme impairment for very complicated tasks; a mild impairment in maintaining attention to perform simple or multi-step repetitive tasks; and a moderate impairment in withstanding the stress and pressures of day-to-day work. (Tr. 637-638)  Dr. Robie diagnosed post-traumatic stress disorder, dysthymic disorder, alcohol abuse in full sustained remission per patient report, and borderline intellectual functioning.  (Tr. 638)  Dr. Robie assigned a GAF rating of 53.  (Tr. 637-8)

### 3.  Reviewing Physicians

Agency reviewing psychologist, David Dietz, Ph.D., completed a psychiatric review technique on July 15, 2010.  (Tr. 639-652) Dr. Dietz opined that plaintiff had a mild restriction in activities of daily living, a moderate limitation in difficulties maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 649)  Dr. Deitz did not state an opinion related to plaintiff's mental residual functional capacity. (Doc. 15, p. 5)

In October 2010, agency reviewing psychologist, Karla Voyten, Ph.D., affirmed the initial psychiatric review technique, without stating any limitations.  (Tr. 825)

### D.  Testimonial Evidence

#### 1.  Brenda Hardiman's Testimony on October 31, 2013

Plaintiff was represented by counsel and testified at the administrative hearing on October 31, 2013. (Tr. 42)  Plaintiff testified that she lives with her two children as she did at the time of the January 2012 hearing.  (Tr. 44)  Ms. Hardiman stated she stopped working for Clean Team more than a year prior to the hearing because of not feeling well and pain.  (Tr. 45)  She testified that her back pain had gotten worse since January 2012 and that she is only able to walk about a half of a block.  (Tr. 46)  She further stated that she can only stand maybe five minutes compared to 30 minutes back in 2012.  (Tr. 47)  Ms. Hardiman stated that her back hurts and that she gets light headed and ready to faint if she stands more than five minutes.  (Tr. 47)  She testified that these changes have gradually gotten worse beginning over a year ago. (Tr. 47)  Ms. Hardiman testified that she could currently sit no more than 15-20 minutes compared to 45-60 minutes at the 2012 hearing because of her back pain. (Tr. 47)  Additionally, she can no longer pick up a gallon of milk.  (Tr. 47)

Plaintiff testified that she no longer sees Dr. Saad but is seeing a different doctor at Mercy Family Physicians.  (Tr. 48)  She continues to treat with Dr. Duggan at UTMC for HIV treatment. (Tr. 48)  Additionally, Ms. Hardiman sees CNP Bingham once a month for depression and psychological help. (Tr. 48)  CNP Bingham counsels Ms. Hardiman and has prescribed Celexa, Risperdal and Restoril for her. (Tr. 49)  Hardiman testified that the medications no longer help her like they did at first because she gets up in the middle of the night and hears voices. (Tr. 49)  She stated that she sleeps less than four hours a night because she wakes up feeling paranoid about people. (Tr. 49)  Also, at night she periodically takes 800 milligrams of Motrin to help her pain back.  (Tr. 50)  Ms. Hardiman said that she may doze off for

8

approximately ten minutes during the day. (Tr. 50)

Similar to the prior hearing, Ms. Hardiman testified that she still gets her daughter off to school and then lies down and watches television. (Tr. 50) She stated that she cannot do any chores, she does not have any hobbies and she is not involved in any social activities. (Tr. 51) She also testified that her memory has gradually gotten worse. (Tr. 51) Ms. Hardiman testified that from time to time she still experiences numbness in her right foot and toes. (Tr. 52) She also stated that she continues to use a cane every day for balance in case her back gives out. (Tr. 52)

Ms. Hardiman stated that the paranoia causes her to want to avoid people. (Tr. 53) She testified that, if she cannot avoid going to a store, she will go with her brother or her brother's girlfriend. (Tr. 53) She stopped driving about a year ago due to her paranoia that someone will hit her car or otherwise be in a car accident. (Tr. 53-54)

> ### 2. **Ms. Hardiman also testified that over the couple of months prior to the hearing, she could not keep up the physical pace she used to be able to maintain; and she stated that her kids have mentioned this to her as well. (Tr. 54)Sue Carter's Testimony**

Ms. Carter stated that she is a social worker and licensed counselor at the University of Toledo. (Tr. 55) She has been talking with Ms. Hardiman about her depression for two to three years. (Tr. 55) Ms. Carter testified that Ms. Hardiman would often cancel her office appointments but they would talk on the telephone because Hardiman had trouble leaving her house. (Tr. 55-56) She described Hardiman as someone with no friends or social life and because of the child abuse Hardiman suffered, she did not trust anyone. (Tr. 56) Ms. Carter also testified that Ms. Hardiman was very afraid something terrible would happen to her children so she did not want them left alone. (Tr. 56) Carter stated that Ms. Hardiman felt people were

talking about her HIV diagnosis, making Hardiman afraid to go out in public.  (Tr. 57)

Ms. Carter testified that she wanted Hardiman to see a psychiatric nurse because she was hearing voices, had suicidal ideation and had experienced blackouts during rages with family members, presumably over the abuse.  (Tr. 57)

Physically speaking, Ms. Carter testified that she has noticed that Hardiman's speech had really slowed down over the months. (Tr. 58)  Ms. Carter said Ms. Hardiman was not able to respond to questions very well nor did she make eye contact.  (Tr. 58)

Referring to the date of this hearing, Ms. Carter noticed that Hardiman was even more non-responsive and felt something profound had happened to Hardiman physically.  (Tr. 59) When questioned about the dates that Ms. Carter has noticed the slurred speech, Ms. Carter stated she last saw Hardiman in April or May (2013) and by the time she saw her and talked to her in September (2013) that she noticed a significant decline in Hardiman's speech.  (Tr. 60) Carter went on to say that the last meaningful conversation she had with Hardiman would have been in August 2013.  (Tr. 61)

Carter further testified that the medications prescribed by CNP David Bingham were able to help Hardiman sleep.  (Tr. 61)  Carter confirmed that Hardiman is not on any medication for HIV. (Tr. 62)

### 3.  Vocational Expert's Testimony

Vocational Expert ("VE"), Charles McBee, testified at the hearing.  (Tr. 63)   The VE was asked to consider a hypothetical individual of plaintiff's age, education and work experience with a residual functional capacity for medium work with the following limitations: no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling, frequent use of the bilateral lower extremities for

operation of foot controls with manipulative limitations for occasional use of bilateral upper extremities for pushing and pulling, and environmental limitations to avoid all exposure to unprotected heights.  (Tr. 63-64).  Additional limitations the VE was asked to consider for this hypothetical individual were: avoidance to exposure to commercial driving, moving machinery, humidity, wetness, irritants such as fumes, odors, dust, gases, extreme cold or heat and vibration. (Tr. 64)  The VE was also asked to consider work that is limited to simple routine and repetitive tasks in an environment free of fast-paced production requirements, involved only work-related decisions with few work place changes and occasional interaction with the general public, coworkers and supervisors.  (Tr. 64) Considering the foregoing, the VE was asked whether there were any jobs available that such a hypothetical individual could perform.  (Tr. 64)

The VE testified that at a medium exertional level, such a hypothetical individual would be capable of working as a hand packager with 1,700 jobs available in Ohio and 150,000 available nationally. (Tr. 64-65)  Such an individual could also work as a production helper with 1,700 jobs available in Ohio and 65,000 available nationally.  (Tr. 64-65)

The second hypothetical had the same limitations as above but was changed to light exertional work.  (Tr. 65)  The VE testified that this hypothetical individual would be able to work the following positions:  a shipping and receiving weigher with 1,200 jobs available state wide and 90,000 available nationwide; a photocopy machine operator with 2,000 available state wide and 135,000 nationwide; and as an inspector and hand packager with 2,000 available in Ohio and 75,000 available in the national economy.  (Tr.65)

For the third hypothetical, the VE was told to assume that the hypothetical individual had the same light exertional level but the individual would have a sit and stand option providing they are not off task more than ten percent of the work period.  (Tr. 65-66)  With this criteria, the

11

VE stated that the shipping and receiving weigher position would be eliminated.  (Tr. 66)  The VE further testified that this third hypothetical would allow for the position of a bagger of garments position with 2,000 in Ohio and 90,000 nationally. (Tr. 66)  However, the VE clarified that since the Dictionary of Occupational Titles does not specifically address the sit/stand option, this response is based on his experience and education.  (Tr. 66)

For the fourth hypothetical, the VE was asked to consider the same light exertional level with the sit/stand option but now must also consider that the hypothetical individual would have no interaction with the general public, have occasional interaction with coworkers and supervisors, be permitted to be absent from work more than three times per month and be allowed to consistently be off task more than 25 percent of the work period.  (Tr. 67)  The VE stated that there would not be any work available for this fourth hypothetical individual.  (Tr. 67)  The VE went on to say that employers generally require employees to be on task for at least 80 percent of the time which includes scheduled breaks and lunch.  (Tr. 67)  Being off task more than 20 percent is grounds for severe reprimand and/or dismissal. (Tr. 67-68)  Further answering, the VE stated that an individual should not miss more than one day per month beyond normal sick time or vacation time.  (Tr. 68)

In regards to hypothetical number three, the VE clarified when asked by the attorney for plaintiff that employees with 20 percent less production are usually subject to some type of reprimand and/or dismissal.  (Tr. 68-69)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V. The ALJ's Decision

The ALJ issued a decision on December 11, 2013.  A summary of his findings is as follows:

1. Hardiman has not engaged in substantial gainful activity since October 28, 2009, the application date.  (Tr. 16)

2. Hardiman has the following severe impairments: dysthymic disorder (schizoaffective disorder), posttraumatic stress disorder, borderline intellectual functioning, alcohol abuse in remission, conversion reaction, mild median nerve mononeuropathy, history of CVA's due to uncontrolled hypertension without any residual neurological deficits, and obesity.  (Tr. 17)

3. Hardiman does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 18)

4. Hardiman has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b) except postural limitation of no climbing of ladders, ropes or scaffolds.  Hardiman is limited to occasional climbing of ramps and stairs and occasional balancing, stooping, kneeling, crouching and crawling.  The claimant is limited to frequent use of the bilateral lower extremities for the operation of foot controls; manipulative limitation of occasional use of the bilateral upper extremities for pushing and pulling.  Hardiman has environmental limitation to avoid all exposure to unprotected heights.  Hardiman should avoid moderate exposure to moving machinery, humidity, wetness, irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, and vibrations.  Work for Hardiman should be limited to simple, routine and repetitive tasks in a work environment free of faced paced production requirements, involving only work related decisions with few if any work place changes.  Hardiman can occasionally interact with the general public, coworkers and supervisors. (Tr. 21)

5. Hardiman has no past relevant work.  (Tr. 30)

6. Hardiman was born on September 29, 1970 and was 39 years old, which is defined as a younger individual age 18-49 on the date the application was filed. (Tr. 30)

14

7.  Hardiman has at least a high school education and is able to communicate in English.  (Tr. 30)

8.  Transferability of job skills is not an issue because Hardiman does not have past relevant work. (Tr. 30)

9.  Considering Ms. Hardiman's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.  (Tr. 30)

Based on the foregoing, the ALJ determined that Hardiman has not been under a disability from October 28, 2009.  (Tr. 31)

## VI.    Parties' Arguments

Plaintiff filed her brief on the merits on October 23, 2015.  (Doc. 15)  Plaintiff argues that the administrative law judge erred in his evaluation of medical source opinion by not assigning controlling weight to Mr. Bingham's medical source statement.  (Doc. 15, p. 12-20)  Plaintiff acknowledges that Mr. Bingham is not a physician but argues that his statement should have been given greater weight because it was signed by Dr. Valko.  (Doc. 15, p. 12-13)  Plaintiff argues that the ALJ should have addressed the impact such a signature had on the medical source statement when he assessed the weight to be given to the statement.  (Doc. 15, p. 13)

Plaintiff next argues that the ALJ incorrectly treated Mr. Bingham's statement as a non-acceptable medical source.  Plaintiff argues that the ALJ should have provided a more detailed explanation as to his treatment of Mr. Bingham's medical source statement.  For example, plaintiff points to the ALJ's decision where he stated that the evidence in the record only supports that plaintiff occasionally experienced auditory hallucinations.  Plaintiff argues that the ALJ should have also discussed the effect that occasional auditory hallucinations would have had on plaintiff's ability to work.  (Doc. 15, p. 16)  Plaintiff also points out other decisions by the ALJ related to plaintiff's ability to remain productive at work and her likely absenteeism and

15

argues that there was evidence contrary to the ALJ's judgment. (Doc. 16, p. 17)

Plaintiff also argues that the ALJ improperly weighed and relied on the non-treating source of Dr. Robie, a one-time consultative examiner. (Doc. 15, p. 16) Plaintiff argues that the ALJ did not explain why the opinion of Dr. Robie, who conducted a single examination of plaintiff three years before the treating source offered an opinion, deserved greater weight than the opinion of the treating source. (Doc. 15, p. 16) Plaintiff points out that she saw Mr. Bingham 12 times between August 2012 and October 2013. She argues that the ALJ failed to properly evaluate his opinion and that this matter should be remanded. (Doc. 15, p. 20)

Defendant filed a brief on December 23, 2015. (Doc. 17) Defendant argues that plaintiff has waived all arguments not raised in her brief. Plaintiff only raised the issue of the ALJ's evaluation of her mental impairments and defendant limited its responsive brief to this issue as well. Defendant argues that it is factually inaccurate for plaintiff to assert that the ALJ found Mr. Bingham's medical source statement, which was signed by Dr. Valko, to be the opinion of a "non-acceptable medical source." Defendant points out that the ALJ found this opinion to be the opinion of an "other medical source." Defendant also points out that Mr. Bingham's notes in which he assigned a GAF scale score are not signed by Dr. Valko or any other acceptable medical source. Defendant argues that there is no indication that Dr. Valko even saw those notes. Accordingly, the ALJ did not err in finding Mr. Bingham's notes from October 2, 2013 to be those of a non-acceptable medical source. (Doc. 17, p. 3)

Defendant also argues that the ALJ did articulate his reasons for not assigning controlling weight to the opinion of Mr. Bingham and Dr. Valko. (Doc. 17, p. 5) Defendant argues that the ALJ acknowledged that Mr. Bingham and Dr. Valko were treating sources and provided a sufficient analysis based on evidence in the record to explain why their opinion was inconsistent

with the evidence as a whole and even with his Mr. Bingham's records.  (Doc. 17, p. 5-6)
Defendant also contends that Mr. Bingham's opinion was based primarily on plaintiff's
subjective complaints.  Defendant argues that the ALJ reasonably discounted certain portions of
Mr. Bingham's opinion that were extreme.  (Doc. 17, p. 6)  Defendant points out that the ALJ
pointed to specific evidence in the record when he discounted some of Mr. Bingham's opinions
regarding plaintiff's ability to work.  Defendant also argues that the ALJ appropriately
considered Dr. Robie's opinion and found that it was consistent with the record as a whole.
Defendant argues that the ALJ's decision was supported by substantial evidence and should
stand.  (Doc. 17, p. 10-11)

Plaintiff filed a reply on January 6, 2016. (Doc. 18)  Plaintiff argues that defendant has
misconstrued the case law cited in its brief.  Plaintiff contends that the case law supports her
argument that the content of the ALJ's decision was insufficient to explain why he discounted
Mr. Bingham's opinion. (Doc. 18, p. 2)  Plaintiff argues that defendant's contention that Mr.
Bingham's opinion was based on subjective complaints was not addressed in the ALJ's decision
and cannot be considered here.  (Doc. 18, p. 3)  Plaintiff also argues that the defendant has not
responded to plaintiff's argument that the ALJ failed to provide an adequate explanation for his
findings related to plaintiff's occasional auditory hallucinations.  (Doc. 18, p. 4)  The court has
considered the parties' arguments and its recommendation is stated below.

## VII.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273  (6th Cir. 1997).   This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

18

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

**B. Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Medical Source Opinions/Treating Physician Rule**

At the outset, this court agrees with defendant that its review should be limited to the particular points that Ms. Hardiman has raised in her brief on appeal. See *Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006)  Plaintiff has narrowly focused her appeal on the ALJ's consideration of the opinion of Mr. Bingham, a certified nurse practitioner, and the court has limited its review to this issue as well.

Plaintiff argues that the ALJ did not articulate good reasons for failing to assign controlling weight to the opinion of Mr. Bingham, which was co-signed by psychiatrist, Tim Valko.  The administrative regulations implementing the Social Security Act impose standards

on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

Here, plaintiff contends that the ALJ failed to provide good reasons for his treatment of

the opinion provided by Mr. Bingham, a certified nurse practitioner. However, it is well-established that nurse practitioners, such as Mr. Bingham, are not "acceptable medical sources." See e.g. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007); *Salyer v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 108672, 2012 WL 3156986 at * 5 (S.D. Ohio Aug. 3, 2012); *Wagner v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 102504, 2012 WL 3023266 at * 12 (N.D. Ohio July 24, 2012). Rather, a nurse practitioner is an "other source" pursuant to 20 C.F.R § 416.913(d)(1), which is neither entitled to controlling weight nor subject to the "good reasons" requirement of the treating physician rule. See SSR 06-03p, 2006 SSR LEXIS 5 at *4, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 121823, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012). The ALJ properly points out that Mr. Bingham's statement is not considered a "medical opinion."

Plaintiff argues that, because Dr. Valko signed the medical source statement completed by Mr. Bingham, that the opinion was entitled to greater weight. However, case law holds that a "team" opinion signed by physician and nurse practitioner does not qualify as a treating source opinion when there is no evidence demonstrating that the statement presented to the ALJ represented the opinions of a team effort, or that the medical facility used a team approach to a claimant's mental health treatment. *Ceballos v. Astrue,* 2009 U.S. Dist. LEXIS 71030, 2009 WL 2475472, *7-9 (D. Kan. Aug. 12, 2009); see also *Nichols v. Comm'r of Soc. Sec.*, 260 F.Supp.2d 1057, 1065 (D. Kan. 2003) (although a supervising physician signed the "other" medical source's opinion, the court declined to consider them a team because there was no evidence the "other" medical source was working closely under the physician's supervision, or had consulted with the physician, and the record did not indicate the physician had treated the claimant other than a mere signature on the report); *Metivier v. Barnhart,* 282 F.Supp.2d 1220, 1226-1227 (D. Kan.

21

2003) (declined to find a treating team and thus no treating source when there was no evidence of a close working relationship or active supervision between the physician and the "other" medical source, and only one mention of the physician in the treatment record); *Colson v. Barnhart,* 2003 U.S. Dist. LEXIS 3695, 2003 WL 1092745, *2-3 (D. Me. Mar. 13, 2003) (refused to consider the nurse practitioner's opinion as a treating source opinion because "there is no indication in the nurse practitioner's records that she was working other than on her own in her treatment of the plaintiff.") Plaintiff has not cited any evidence of record indicating that she was actually seen and treated by the co-signing psychiatrist.  The court has scanned the records from Valko and Associates to determine whether Dr. Valko saw the patient.  No records of such contacts were found.  Even the Medical Source Statement co-signed by CNP Bingham and Dr. Valko lists Bingham as the "Source."  (Tr. 965)  For this reason, the ALJ was not required to assign greater weight to the opinion of Mr. Bingham or even to state good reasons for discounting his opinion.  See SSR 06-03p, 2006 SSR LEXIS 5 at *4, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 121823, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).

Nonetheless, the ALJ did provide a detailed explanation as to why he discounted the opinion of Mr. Bingham and Dr. Valko.  (Tr. 28-30)  He stated:

> On October 9, 2013, Mr. Bingham completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments, which was cosigned by psychiatrist, Tim Valko.  They found that the claimant would be able to remember, understand and follow directions for simple tasks less than 80 percent but more than 2/3 of the time, because she had difficulty following simple medication changes.  They opined that the claimant's ability to maintain attention and concentration for two hour periods of time was less than 2/3 of the time, because the claimant had active auditory hallucinations that interfere with her ability to focus and pay attention.  The evidence of record indicates that the claimant only occasionally experienced auditory hallucinations. The claimant's treatment notes indicate that her memory/concentration was intact

for short and long term.  However, the undersigned finds that the [sic] Dr. Robie opined that the claimant had mild impairments for simple tasks, due to difficulty with concentration and memory, as well as cognitive impairment for very complicated tasks.  Therefore, the undersigned finds that the evidence of record supports that the claimant is limited to simple, routine and repetitive tasks.

In addition, Mr. Bingham and Dr. Valko further opined that the claimant's ability to perform work activities at a reasonable pace was severely impaired and she could perform no fast or externally imposed pace and the claimant would be more than 25 percent less productive than an unimpaired worker because the claimant moved very slow and she was hyper vigilant, due to paranoia and this slowed her activity.  The undersigned finds that the evidence from the claimant's treatment notes indicate only occasional paranoia.  Dr. Robie opined that the claimant had moderate impairment in withstanding the stress and pressures associated with day-to-day work, due to poor adaptive coping skills.  The undersigned finds that the evidence of record supports the claimant is limited to work environment free of fast paced production requirements, involving only work related decisions with few if any work place changes.

Mr. Bingham and Dr. Valko opined that the claimant would miss more than three times per month of work, due to difficulty leaving her home.  The undersigned finds that although the claimant reported difficulty leaving her home, the evidence of record does not support this.  The claimant is able to go shopping for her family with the assistance of others and she was able to attend medical appointments.  They also opined that the claimant was unable to consistently interact in a manner that was appropriate to customer expectations and would not be successful in working with the public, as well as she would frequently be distracted by co-workers or would be distracting to them, because she is paranoid and fearful of people.  Her behaviors are sometimes odd and would be disturbing to others.  The undersigned finds that the evidence of record supports the claimant would have some difficulty with social functioning.  The claimant's treatment notes indicate that her affect and mood were consistently normal with exception of a few times when she was noted as having an anxious mood and flat affect.  In addition, Dr. Robie opined that the claimant could relate to others on a superficial basis, but she did not like to do so.  She had moderate impairment if prolonged interaction is required, because of social uneasiness and disinterest.  The undersigned finds that the evidence of record supports that the claimant is limited to occasional interaction with the general public.

Mr. Bingham and Dr. Valko stated that the claimant is emotionally fragile and stated that stress caused by even routine and unskilled or low-skilled work is likely to cause her to decompensate.  He reported that the claimant would be likely to be successful only in a sheltered environment and stated that she had difficulty with simple household chores.  He added that the claimant had only a partial response to medication and that hallucination and delusions persist and

> prohibit regular contact with the public. Again, the undersigned finds that the evidence of record does not support that the claimant hallucination and delusions have persisted. In addition, there is evidence of record that the claimant has frequently failed to take medication as prescribed and some of those times is when she experienced hallucinations. The undersigned finds that the opinion and GAF assessment of Mr. Bingham and Dr. Valko are inconsistent with the evidence of record. Therefore, the undersigned gives little weight to the [sic] Mr. Bingham's and Dr. Valko's opinions. (internal citations omitted)

In stating this explanation, the ALJ provided a detailed account, pointing to specific evidence in the record, as to why he did not assign greater weight to the non-medical opinion of Mr. Bingham and Dr. Valko, even though he was arguably not required to do so.

Plaintiff argues that it was improper for the ALJ to compare Mr. Bingham's opinion to Dr. Robie's opinion, who was a one-time consultative examiner. While the court would agree with plaintiff that this comparison would be questionable if Mr. Bingham was considered a treating source, the ALJ clearly explained that Mr. Bingham's opinion was not a "medical opinion" and did not qualify under the definition of acceptable medical source. As stated above, the ALJ was not required to consider Mr. Bingham as an acceptable medical source, let alone assign controlling weight to his opinion as if he were a treating physician. As explained in *Hill v. Comm'r of Soc. Sec.,* 560 Fed. Appx. 547, 2014 U.S. App. LEXIS 5848 (6th Cir. 2014), "[a]n ALJ must consider other-source opinions and generally should explain the weight given to opinions for these 'other sources.' But other-source opinions are not entitled to any special deference." (internal citations and quotation marks omitted). The requirement that an ALJ consider and explain the weight ascribed to an "other source" is not a demanding standard. See, e.g., *Washington v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 101172 (W.D. Mich. Apr. 1, 2014); *Davis-Gordy v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 140258 (W.D. Mich. Sept. 30, 2013). Thus, the ALJ was not required to assign more weight to the opinion of Mr. Bingham

than he did to the opinion of Dr. Robie, a one-time consultative examiner.

This court recognizes that the foregoing analysis might seem hyper-technical to the plaintiff, particularly given her extensive contact with a board certified Adult Psychiatric Mental Health Clinical Nurse Specialist. But, as explained above, the court's analysis of the issues presented is constrained. The court may not substitute its judgment of the facts for the judgment reached by the ALJ. Where, as here, the evidence before the ALJ was in conflict, the court must search the record to determine whether the ALJ's decision was supported by substantial evidence and whether the ALJ applied a correct legal analysis. Although there was evidence to support plaintiff's claim, the court has explained how there also was substantial evidence in the record cited by the ALJ to support the conclusion reached; and the record demonstrates that the ALJ followed and correctly applied the controlling law. Cases like this one bespeak the need for the Social Security Administration or the Congress to re-evaluate the governing rules and law relating to the treatment of nurse practitioner opinions.

## VIII.  Conclusion

In summary, the court should find that the ALJ properly considered and weighed the evidence; including the medical source statement submitted by David Bingham, plaintiff's therapist and certified nurse practitioner.  The ALJ's decision is supported by substantial evidence, and the correct legal analysis was applied.  Ms. Hardiman has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  For these reasons, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: June 13, 2016

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**